# United States Court of Appeals
# for the Federal Circuit

---

**NEXTEEL CO., LTD.,**
*Plaintiff-Appellee*

**SEAH STEEL CORP.,**
*Plaintiff-Cross-Appellant*

**v.**

**UNITED STATES, MAVERICK TUBE
CORPORATION, TENARIS BAY CITY, INC.,**
*Defendants-Appellees*

**UNITED STATES STEEL CORPORATION,**
*Defendant-Appellant*

---

2021-1334, 2021-1430

---

Appeals from the United States Court of International Trade in No. 1:18-cv-00083-JCG, Judge Jennifer Choe-Groves.

---

Decided: March 11, 2022

---

HENRY DAVID ALMOND, Arnold & Porter Kaye Scholer LLP, Washington, DC, argued for plaintiff-appellee. Also represented by LESLIE BAILEY, CHRISTINE CHOI, KANG WOO LEE, J. DAVID PARK, DANIEL WILSON.

JEFFREY M. WINTON, Winton & Chapman PLLC, Washington, DC, argued for plaintiff-cross-appellant. Also represented by MICHAEL JOHN CHAPMAN, JOOYOUN JEONG, VI MAI.

HARDEEP KAUR JOSAN, International Trade Field Office, United States Department of Justice, New York, NY, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, CLAUDIA BURKE, JEANNE DAVIDSON; MYKHAYLO GRYZLOV, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

GREGORY J. SPAK, White & Case LLP, Washington, DC, for defendants-appellees Maverick Tube Corporation, Tenaris Bay City, Inc. Also represented by FRANK JOHN SCHWEITZER, MATTHEW WOLF SOLOMON, KRISTINA ZISSIS.

THOMAS M. BELINE, Cassidy Levy Kent (USA) LLP, Washington, DC, argued for defendant-appellant. Also represented by MYLES SAMUEL GETLAN, JAMES EDWARD RANSDELL, IV, SARAH E. SHULMAN.

_____

Before O'MALLEY, BRYSON, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

This appeal arises out of the United States Department of Commerce's administrative review of its antidumping order on oil country tubular goods from the Republic of Korea.

Calculating constructed value, Commerce found five circumstances that created a "particular market situation" affecting inputs to oil country tubular goods. The Court of International Trade determined that this finding was not supported by substantial evidence and "direct[ed] Commerce to reverse its finding of a particular market

situation." *NEXTEEL Co. v. United States*, 450 F. Supp. 3d 1333, 1343 (Ct. Int'l Trade 2020). We find that three of the five circumstances Commerce relied on to show a particular market situation are not supported by substantial evidence. Thus, with modified reasoning, we affirm the trial court's conclusion that substantial evidence does not support Commerce's finding. But because the Court of International Trade lacks authority to reverse Commerce, we vacate the trial court's opinion to the extent that it directs Commerce to reach a certain outcome.

Comparing normal value to export price, Commerce relied on its "differential pricing analysis" methodology. In *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), we vacated aspects of Commerce's differential pricing analysis over concerns about Commerce's use of statistical methodologies when certain preconditions for their use are not met. *Id.* at 1360. Commerce's analysis here raises identical concerns, so we vacate the trial court's decision upholding the methodology and remand for reconsideration in view of *Stupp*.

Seeing no error in the other methodologies that Cross-Appellant challenges, we otherwise affirm.

BACKGROUND

In 2016, the Department of Commerce initiated its second administrative review of the antidumping order on oil country tubular goods (OCTG) from the Republic of Korea (Korea). Certain Oil Country Tubular Goods from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016, 82 Fed. Reg. 46,963, 46,963 (Oct. 10, 2017) (*Preliminary Results*). The review covered the period from September 1, 2015 through August 31, 2016. *Id.* Commerce selected for individual examination the two companies that accounted for the largest volume of subject merchandise during the period of review, NEXTEEL Co., Ltd. and SeAH Steel Corporation. Decision

Memorandum for Preliminary Results, at 2, 82 ITADOC 46,963 (Oct. 2, 2017) (*Preliminary Results Memo*).

In an antidumping review, Commerce generally compares the price at which the subject merchandise is sold in the United States to the "normal value," which is the price of like products in the exporting country or a third country. 19 U.S.C. §§ 1677(35), 1677a(a), 1677b(a). Calculating normal value, Commerce determined that "neither respondent had a viable home market or third-country market during the [period of review]." *Preliminary Results Memo* at 11. Commerce therefore based its calculation of the normal value on constructed value pursuant to 19 U.S.C. § 1677b(a)(4). *Preliminary Results Memo* at 11. Constructed value is based on the costs of producing and selling the merchandise, with an allowance for profits. 19 U.S.C. § 1677b(e).

Considering costs, Commerce found "a particular market situation" under 19 U.S.C. § 1677b(e), affecting two inputs to OCTG: hot-rolled coil (HRC) and electricity. Decision Memorandum for Final Results, at 16–17, 83 ITADOC 17,146 (Apr. 11, 2018) (*Final Results Memo*). Commerce found a particular market situation "based on the collective impact of Korean HRC subsidies, Korean imports of HRC from China, strategic alliances, and government involvement in the Korean electricity market." *Id.* at 17. Having found a particular market situation, Commerce adjusted the cost of HRC in its calculation based on the countervailing duty rate determined for POSCO, a Korean HRC producer, in Hot-Rolled Steel Flat Products from Korea. *Final Results Memo* at 29;[1] Appx7560 (SeAH Preliminary Results Analysis Memorandum).

---

[1]    Citing Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of

Commerce calculated the profit component of constructed value under § 1677b(e)(2)(B)(iii), which allows Commerce to calculate profits using "any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than [the specific exporter or producer examined])." The agency calculated profit based on SeAH's Canadian sales of OCTG. *Final Results Memo* at 55. Turning to the profit cap, Commerce again relied on SeAH's Canadian sales as "facts available." *Id.* at 60. Commerce reasoned that these sales were the best choice for a profit cap because they are "specific to OCTG and represent[] the production experience of a Korean OCTG producer in Korea." *Id.*

When calculating export price, Commerce adjusted for freight expenses pursuant to 19 U.S.C. § 1677a(c)(2)(A). *Final Results Memo* at 87–88. Following its "normal practice," Commerce capped the amount of freight revenue in its calculation at the amount of freight charges incurred. *Id.* at 87; Appx7554–55 (SeAH Preliminary Results Analysis Memorandum).

Finally, Commerce compared export price and normal value. Employing its "differential pricing analysis" methodology based on a statistic called "Cohen's *d*," Commerce found a pattern of U.S. prices that "differ significantly among purchasers, regions, or periods of time" under 19 U.S.C. § 1677f-1(d)(1)(B)(i). Based on this analysis, Commerce used an "average-to-transaction" comparison method, *Preliminary Results Memo* at 10–11; *Final Results Memo* at 76, comparing averaged normal value prices to

---

Korea: Final Affirmative Determination, 81 Fed. Reg. 53,439 (Aug. 12, 2016), *as amended by* 81 Fed. Reg. 67,960 (Oct. 3, 2016).

non-averaged export prices of individual transactions, 19 U.S.C. § 1677f-1(d)(1)(B).

NEXTEEL and SeAH appealed the Final Results to the Court of International Trade, arguing that Commerce's particular market situation, profit cap, freight revenue cap, and differential pricing analyses were unsupported by substantial evidence or not in accordance with law. *NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276, 1282–83. (Ct. Int'l Trade 2019) (*NEXTEEL I*). The court concluded that Commerce's particular market situation finding was unsupported by substantial evidence. *Id.* at 1288. It remanded for further proceedings on that issue. *Id.* The court affirmed Commerce's profit cap, freight revenue cap, and differential pricing analyses. *Id.* at 1290, 1293, 1295–97.

On remand, Commerce continued to find a particular market situation, relying on a fifth factor, "steel industry restructuring effort by the Korean government," along with the previous four. Final Results of Redetermination Pursuant to Ct. Remand at 20, *NEXTEEL I*, 392 F. Supp. 3d 1276 (No. 18-00083), ECF No. 81-1 (*First Remand Results*).

Reviewing Commerce's first remand results, the Court of International Trade rejected Commerce's finding of a particular market situation as unsupported by substantial evidence, "both when viewing the five factors individually and collectively." *NEXTEEL Co. v. United States*, 450 F. Supp. 3d 1333, 1343 (Ct. Int'l Trade 2020) (*NEXTEEL II*). The court remanded the issue to Commerce a second time, this time "direct[ing] Commerce to reverse its finding of a particular market situation." *Id.*

Under protest, Commerce reversed its finding of a particular market situation and recalculated the dumping margins accordingly. Final Results of Redetermination Pursuant to Ct. Remand at 4–5, *NEXTEEL II*, 450 F. Supp. 3d 1333 (No. 18-00083), ECF No. 96-1 (*Second Remand Results*). The Court of International Trade affirmed

Commerce's second remand results. *NEXTEEL Co. v. United States*, 475 F. Supp. 3d 1378, 1380 (Ct. Int'l Trade 2020).

United States Steel appeals, challenging the trial court's ruling that Commerce's finding of a particular market situation is unsupported by substantial evidence, as well as the trial court's direction to Commerce to reach a particular outcome on its second remand. SeAH cross appeals, challenging the trial court's affirmance of Commerce's differential pricing analysis, its freight revenue cap, and its use of SeAH's own data as a profit cap.

## ANALYSIS

### I. Standard of Review

"We review a decision of the Court of International Trade evaluating an antidumping determination by Commerce by reapplying the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399 (Fed. Cir. 2014). Thus, "[w]e will uphold Commerce's determination unless it is unsupported by substantial evidence on the record or otherwise not in accordance with the law." *Id.*; 19 U.S.C. § 1516a(b)(1)(B)(i).

When "identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute," we recognize the technical expertise of the agency and give it deference "both greater than and distinct from that accorded the agency in interpreting the statutes it administers." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

### II. Particular Market Situation

The Trade Preferences Extension Act of 2015 (TPEA) allows Commerce to consider a "particular market situation" when calculating constructed value. Pub. L. No. 114-

27, § 504, 129 Stat. 362, 385. Under 19 U.S.C. § 1677b(e), as revised by the TPEA,

> if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology.

The statute does not define "particular market situation," but the plain language of § 1677b(e) identifies the factual support Commerce must provide to invoke this provision. Commerce must find that the cost incurred to produce the subject merchandise "does not accurately reflect the cost of production in the ordinary course of trade." 19 U.S.C. § 1677b(e). As the Court of International Trade has noted, the circumstances supporting a "particular" market situation also must be "particular" to producers of the subject merchandise during the relevant period. *See SeAH Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1393 (Ct. Int'l Trade 2021). An ongoing global phenomenon would not alone constitute a deviation from the "ordinary course of trade."

Congress provided examples of a particular market situation:

> [A] "particular market situation" . . . might exist . . . where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set. It also may be the case that a particular market situation could arise from differing patterns of demand in the United States and in the foreign market. For example, if significant price changes are closely correlated with holidays which occur at different times of the year in the two markets, the prices in the

> foreign market may not be suitable for comparison to prices to the United States.

Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 822 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4162. These are all situations in which some circumstance distorts costs so that they are not set based on normal market forces or do not move with the rest of the market.

Nothing in the statute requires Commerce to quantify the distortion precisely. Still, a quantitative comparison showing a difference between costs incurred and costs in the ordinary course of trade could be substantial evidence supporting the existence of a particular market situation. Likewise, evidence that costs do not differ at all from what they would have been in the ordinary course of trade would "fairly detract[] from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

Commerce found a particular market situation based on the "collective impact" of

- Korean government subsidies for HRC production,

- strategic alliances between HRC suppliers and OCTG producers,

- Korean government steel industry restructuring efforts,

- Korean government involvement in the electricity market, and

- imports of low-priced HRC from China.

*Final Results Memo* at 17; *First Remand Results* at 20. We address these circumstances in turn.

*A. Korean Government HRC Subsidies*

Commerce determined that "[r]ecord evidence shows subsidization of HRC by the Korean government," and because "approximately 80 percent of the cost of OCTG production" is the HRC input, "distortions in the HRC market . . . have a significant impact on production costs of OCTG." *First Remand Results* at 21. Commerce relied on an earlier investigation of HRC from Korea from January 1, 2014, through December 31, 2014, which, Commerce explained, found a subsidy rate of almost 60% for POSCO. *Id.* at 21, 18 & n.84. Commerce found that the mandatory respondents in the present review bought HRC from POSCO in significant quantities. *Id.* at 21; *see also* Appx7560 (SeAH Preliminary Results Analysis Memorandum showing 19.9% of HRC purchases from POSCO).

Commerce arrived at the 60% subsidy rate after it determined that it "c[ould] not accurately calculate POSCO's . . . subsidy rate." Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea, at 61, 81 ITADOC 53,439 (Aug. 4, 2016). Commerce thus relied on facts otherwise available and made inferences adverse to POSCO, *id.*, as permitted by 19 U.S.C. § 1677e(a)–(b). The rate Commerce relied on was also from an earlier period of investigation that ended eight months before the present period of review. *See id.* at 3.

But in its first administrative review of the same countervailing duty order, Commerce found de minimis subsidy rates. Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2016, 84 Fed. Reg. 28,461, 28,461 (June 19, 2019), *as amended by* 84 Fed. Reg. 35,604 (July 24, 2019). In that review, Commerce did not rely on adverse facts available. Commerce considered data from January 1, 2016, through December 31, 2016, a period which overlaps with the period of review for this administrative review.

Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review, 2016: Certain Hot-Rolled Steel Flat Products from the Republic of Korea, at 4, 83 ITADOC 24,252 (October 30, 2018).[2] This evidence is at least as probative of the Korean government's actual subsidization during the period of review as the higher rate Commerce relied on.[3]

Commerce could support a finding of a particular market situation with evidence of subsidies to producers of an input to the subject merchandise. But the subsidies must be shown to affect the price of the input so that it does "not accurately reflect the cost of production in the ordinary course of trade," 19 U.S.C. § 1677b(e), and their effect must be "particular" to producers of the subject merchandise, *see SeAH Steel*, 513 F. Supp. 3d at 1393. Here, the record evidence is at best mixed on whether significant Korean government subsidies existed during the period of review. Commerce made no finding that any subsidies were passed through to the prices of HRC or that they affected Korean OCTG producers any more than OCTG producers elsewhere. *See First Remand Results* at 21. Thus, substantial

---

[2]    This evidence was raised before the agency on remand. *First Remand Results* at 54, 59–60.

[3]    *See also* Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination, 82 Fed. Reg. 16,341, 16,341–42 (Apr. 4, 2017) (in an investigation of some of the same alleged subsidy programs as HRC, calculating a subsidy rate of only 4.31% based on partial adverse facts available and for a period of review that overlapped by four months with the period of review here); U.S. Steel Reply Br. 11 n.4 ("[A]t least nine programs alleged in [Hot-Rolled Steel] Korea were also found countervailable in [Cut-to-Length] Plate.").

evidence does not support Commerce's finding that Korean HRC subsidies contribute to a particular market situation.

### B. Strategic Alliances

Based on an affidavit showing that POSCO charged different prices to its affiliates than to its other customers, Commerce found that strategic alliances between HRC and OCTG producers "may have created distortions in the prices of HRC in the past, and may continue to impact HRC pricing in a distortive manner during the instant [period of review] and in the future." *Final Results Memo* at 18. Commerce initially identified no evidence that either SeAH or NEXTEEL was part of such an alliance, that the alliances affected SeAH and NEXTEEL specifically, or that the alliances affected the Korean HRC market as a whole. *See id.* ("[T]he record does not contain specific evidence showing that strategic alliances directly created a distortion in HRC pricing in the current period of review."). On remand, Commerce bolstered its conclusion that such alliances exist by pointing to a SeAH Steel Group brochure that describes a SeAH Steel Group processing center "as the processing center for POSCO," which Commerce concluded "demonstrates a close entanglement between HRC suppliers such as POSCO and OCTG producers." *First Remand Results* at 22–23. SeAH maintains that it was not affiliated with POSCO. SeAH explains that the SeAH entity that runs a "processing center for POSCO" referenced in the brochure had nothing to do with its OCTG operations, and that Commerce has previously found SeAH and POSCO to be unaffiliated. SeAH Resp. Br. 44; Appx7993–94 (SeAH Comments on Draft Remand Redetermination).

Although the parties dispute whether a cost-based particular market situation adjustment must be supported by a showing of market-wide distortions or respondent-specific distortions, Commerce has shown neither. Commerce merely speculated that strategic alliances affected the Korean HRC market as a whole. Its showing of some

relationship between POSCO and SeAH is weak and contradicted by other record evidence. Substantial evidence does not support Commerce's finding that strategic alliances contribute to a particular market situation.

### C. Steel Industry Restructuring

On remand, Commerce cited evidence of government-led restructuring of the Korean steel industry. *First Remand Results* at 25–26. Commerce reasoned that "[t]he Korean government's assistance to accelerate the steel industry's response and restructuring interferes with the normal functioning of the free market and alters the ordinary course of trade." *Id.* at 26. Commerce cited a press release from the Korean Ministry of Strategy and Finance announcing restructuring. *Id.* at 25. As the Court of International Trade noted, though, the period of review concluded on August 31, 2016, and the press release, dated January 25, 2017, announced the Korean government's "2017 Action Plan for Industrial Restructuring." *NEXTEEL II*, 450 F. Supp. 3d at 1343.

The announcement and other publications discussing future restructuring efforts provide no evidence of actual government interference during the period of review. Substantial evidence does not support Commerce's finding that steel industry restructuring efforts contributed to a particular market situation.

* * *

We affirm the Court of International Trade's conclusions in *NEXTEEL II* that three of the circumstances Commerce cited do not support a finding of a particular market situation on the existing record.[4]

---

[4]    Because substantial evidence does not support the above three circumstances, we need not reach the issue of

Commerce has not taken a clear position on whether it believes the other two circumstances alone are sufficient. Indeed, in the *First Remand Results*, Commerce carefully avoided making such a finding. *See First Remand Results* at 27 ("Any one of these four factors *can* distort the market such that Commerce *could* reasonably conclude that a [particular market situation] exists. . . . [T]here is no suggestion that any one of the five factors alone is insufficient to establish the particular market situation. Rather, we evaluate the totality of the circumstances . . . ." (emphases added)). We are not free to substitute our own reasoning for that of the agency and must instead "review only the bases on which Commerce made its determination." *Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1307 (Fed. Cir. 2010); *see also Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) ("[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given . . . ."). But it is far from a foregone conclusion that Commerce would have found a particular market situation based on these two factors alone.

Although low-priced Chinese steel could contribute to a particular market situation, the record does not show sufficient particularity for this circumstance to create a particular market situation on its own. Commerce acknowledged that significant quantities of cheaper Chinese HRC flow to many countries and "affect[] the whole world." *Final Results* at 21; *First Remand Results* at 21–22 (citing a government announcement stating that Chinese excess supply is targeted toward "Korea, ASEAN, and

---

whether substantial evidence supports Commerce's findings that each of the remaining two circumstances contributed to a particular market situation because Commerce explicitly relied on the presence and interaction of all five circumstances. *See First Remand Results* at 27.

EU"); *id.* at 22 (citing an article from Asian Steel Watch that states "China's largest [steel] export destination is South Korea" but also provides data showing that many other countries receive large quantities of Chinese steel).

Government control of electricity prices is a type of distortion expressly contemplated by Congress, but the evidence is mixed on whether the Korean government is involved "to such an extent that home market prices cannot be considered to be competitively set," H.R. Rep. No. 103-316, vol. 1 at 822, and whether the prices are any different from what they would be in the ordinary course of trade. *First Remand Results* at 65 (citing a report showing that Korean electricity prices are lower than Japan's but comparable to median prices among all countries studied). Commerce's countervailing duty determinations have consistently found that Korean electricity prices are set in accordance with market principles and thus that Korean steel producers have not benefited from government involvement in Korean electricity pricing. *E.g., POSCO v. United States*, 337 F. Supp. 3d 1265, 1282–83 (Ct. Int'l Trade 2018) (upholding Commerce's finding that the Korean electricity prices were "set in accordance with market principles," covered costs, and did not confer a benefit to the subject producers); *POSCO v. United States*, 353 F. Supp. 3d 1357, 1368–73 (Ct. Int'l Trade 2018) (sustaining similar findings for a period of investigation from January 1, 2015 through December 31, 2015); *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1303–12 (Ct. Int'l Trade 2017) (sustaining similar findings for welded line pipe from Korea). Commerce has not justified its departure from those findings here. *See* First Remand Results at 66.

We therefore affirm the trial court's decision in *NEXTEEL II* that Commerce's conclusion—"the presence of all five factors, as well as the interaction of the five factors with one another, supports the finding that a [particular market situation] existed in Korea during the relevant

period," *First Remand Results* at 27—was not supported by substantial evidence.

### III. The Court of International Trade's Reversal

Remanding for the second time, the Court of International Trade "direct[ed] Commerce to reverse its finding of a particular market situation." *NEXTEEL II*, 450 F. Supp. 3d at 1343.

"[T]he Court of International Trade is precluded by statute from ever outright reversing a decision by Commerce . . . when reviewing countervailing duty and anti-dumping duty proceedings. Rather, at most it can simply remand for further consideration consistent with its decision." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 515 F.3d 1372, 1383 (Fed. Cir. 2008); 19 U.S.C. § 1516a(c)(3). Remand is appropriate because "the record may well be enlarged" and "even if it is not, new findings and explanations by the Commission can be expected." *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1380–82 (Fed. Cir. 2003) (*Nippon I*) (holding that the Court of International Trade exceeded its authority by re-weighing the evidence and directing a particular outcome on its second remand). Even so, an open-ended remand may not be required if it would be "futile," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006) (*Nippon II*), for example because the record supports only one outcome, *see Nucor Corp. v. United States*, 371 F. App'x 83, 90 (Fed Cir. 2010).

As in *Nippon I*, the court issued its directed remand after one open-ended remand. *NEXTEEL II*, 450 F. Supp. 3d at 1343. The court reversed Commerce based on its weighing of the evidence, e.g., discounting evidence that predated the period of review, *id.* at 1339–42, and not because the record supports only one outcome. Indeed, in view of the conflicting evidence discussed above, the record evidence does not appear to support the *absence* of a particular market situation any more than it supports the

existence of one. Remand was thus no more futile than in *Nippon I*. The court exceeded its authority by directing Commerce to reach a particular outcome. On remand, Commerce may seek to justify the particular market situation in accordance with this opinion.

## IV. Differential Pricing Analysis

By default, Commerce calculates dumping margins by comparing averaged normal value sales to averaged export prices. 19 U.S.C. § 1677f-1(d)(1)(A)(i). Commerce may instead use an "average-to-transaction" comparison, comparing averaged normal value sales to export prices of individual transactions, if it finds a "pattern" of U.S. prices that "differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B).

To show such a "pattern," Commerce uses its "differential pricing analysis" methodology based on a statistic called "Cohen's *d*." Based on this analysis, Commerce relied on an average-to-transaction comparison here. *Preliminary Results Memo* at 10–11; *Final Results Memo* at 76.

SeAH argues Commerce's methodology was flawed because Commerce relied on Cohen's *d* even though the express conditions for its application were not satisfied: that the data sets being compared be normally distributed, have at least 20 or more data points, and have roughly equal variances. SeAH Resp. Br. 67–68. Our recent opinion in *Stupp Corp. v. United States,* 5 F.4th 1341 (Fed. Cir. 2021), addressed the same argument and vacated the Court of International Trade's decision upholding the differential pricing analysis. *Id.* at 1360. Because Commerce's use of Cohen's *d* here presents identical concerns to those in *Stupp*,[5] we vacate this portion of *NEXTEEL I* and remand

---

[5]    *See* Oral Argument at 36:28–43, 42:37–57, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=

to the Court of International Trade to reconsider in view of *Stupp*.

## V. Freight Revenue Cap

To achieve a "fair comparison" between normal value and export price, Commerce must adjust for shipping. *See* 19 U.S.C. § 1677b(a); *Torrington Co. v. United States*, 68 F.3d 1347, 1353 (Fed. Cir. 1995). The export price must be "reduced by . . . the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, . . . which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A).

Commerce starts with the amount charged to the customer for the subject merchandise and subtracts the net freight expense. *Dongguan Sunrise Furniture Co. v. United States*, 36 Ct. Int'l Trade 860, 893 (2012). The net freight expense is the cost of freight ("freight expense") less the amount charged to the customer for freight ("freight revenue"). *Id.* Commerce's "normal practice" is to cap freight revenue at freight cost. *Final Results Memo* at 87; *see Dongguan*, 36 Ct. Int'l Trade at 893. Thus, no adjustment is made if revenue exceeds freight expenses.

Section 1677a(c)(2)(A) requires Commerce to make a freight adjustment but does not specify the method to calculate the adjustment, including whether the "costs, charges, or expenses" incident to moving the subject merchandise should be calculated based on net or gross expenses. *See Dongguan*, 36 Ct. Int'l Trade at 894; SeAH Resp. Br. 74–75 (conceding that the statute does not

---

21-1334_11042021.mp3 (counsel for SeAH acknowledging that *Stupp* "resolves" this issue, and counsel for the United States acknowledging that *Stupp* "governs" and requesting remand on this issue).

indicate how Commerce should treat separately-invoiced freight charges). Commerce has selected a methodology consistent with the statutory language, which we afford greater deference than under the *Chevron* framework. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

SeAH argues Commerce's methodology is unreasonable because it treats profits and losses on shipping differently, reducing export price when the exporter incurs a loss on shipping but not increasing export price when the exporter achieves a profit. SeAH Resp. Br. 75–76. This result is perhaps counterintuitive, but SeAH gives no explanation of why it is unreasonable.

Commerce is not required to show that its chosen methodology is superior to all others. Still, the freight revenue cap has advantages over other possible methodologies. Compared to simply removing the freight revenue cap, Commerce's interpretation ensures that the freight adjustment is only a downward adjustment, as the statute contemplates. 19 U.S.C. § 1677a(c)(2); *Dongguan*, 36 Ct. Int'l Trade at 894 ("The plain language of § 1677a(c)(2) deals exclusively with downward adjustments to U.S. price.").

SeAH contends that it would be reasonable to deduct freight cost from the combined price for the merchandise and freight, regardless of whether the invoiced freight revenue was greater than the freight cost. SeAH Resp. Br. 75. But compared to this proposed method, Commerce's method "prevents an exporter from improperly inflating its export price or [constructed export price] of a good by charging a customer more for freight than the exporter's actual freight expenses." *Final Results Memo* at 87. And Commerce's methodology allows "a proper 'apples-to-apples' comparison" between export price and normal value by excluding "profit earned from the sale of a service (freight) as opposed to profit earned from the sales of

subject merchandise." United States Resp. Br. 23 (quoting *Dongguan*, 36 Ct. Int'l Trade at 895).

SeAH also advocates disregarding separately-invoiced freight altogether and considering only the amount invoiced for the product with no freight adjustment. SeAH Resp. Br. 75. But if separately-invoiced freight were disregarded altogether, an exporter could improperly inflate its export prices by charging more for the merchandise and less for shipping. Such methodology could be inconsistent with the statutory language if the price for the merchandise were inflated in this way. The price charged for the merchandise might include an "amount . . . attributable to [freight expense]," which the agency would have to deduct under 19 U.S.C. § 1677a(c)(2)(A).

Commerce's freight revenue cap methodology is reasonable. We thus affirm the Court of International Trade's decision upholding Commerce's methodology.

## VI. Profit Cap

When normal value is based on constructed value, constructed value includes the actual profit earned by the exporter on its sales of the subject merchandise in the relevant comparison market. 19 U.S.C. § 1677b(e)(2)(A). When that information is unavailable, § 1677b(e)(2)(B) provides that Commerce may calculate profit based on (i) the exporter's profit on the same general category of products in the comparison market, (ii) the average profits earned by other exporters of the subject merchandise in the relevant comparison market, or

> (iii) . . . any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise

that is in the same general category of products as the subject merchandise.

Here, after justifying its departure from the other three methods, Commerce relied on "any other reasonable method" pursuant to § 1677b(e)(2)(B)(iii). *Final Results Memo* at 53–54. The agency calculated profit based on SeAH's Canadian sales of OCTG. *Id.* at 55. Turning to the profit cap, Commerce found that it could not directly calculate the profit cap described in § 1677b(e)(2)(B)(iii) because "[t]here is no profit information for sales in Korea of OCTG and products in the same general category on the record." *Final Results Memo* at 60. Commerce ultimately relied again on SeAH's Canadian sales as a profit cap based on "facts available." *Id.* Commerce determined that these sales were the best choice for a profit cap because they are "specific to OCTG and represent[] the production experience of a Korean OCTG producer in Korea." *Id.*

SeAH argues that Commerce's use of SeAH's own sales to set the profit cap is directly prohibited by the phrase "other than the exporter or producer described in clause (i)" in § 1677b(e)(2)(B)(iii). SeAH Resp. Br. 79–80.

SeAH misreads the statute. Part (iii) describes the quantity Commerce must calculate—the profits normally realized by other exporters. The language "other than the exporter or producer described in clause (i)" clarifies whose profit Commerce must calculate but does not limit the data Commerce may rely on to calculate it. As with any other quantity, Commerce may rely on facts available pursuant to 19 U.S.C. § 1677e(a).

We thus affirm the holding of the Court of International Trade that Commerce's application of the profit cap is lawful.

## CONCLUSION

In summary, we agree with the Court of International Trade that substantial evidence does not support the

existence of a particular market situation created by Commerce's five enumerated circumstances. Because we are limited to reviewing Commerce's reasoning, we do not decide whether a particular market situation could be found based on any subset of the factors or other reasoning. Because the Court of International Trade lacks authority to reverse Commerce, we vacate the trial court's opinion to the extent it directs Commerce to reach a certain outcome.

We vacate the Court of International Trade's decision upholding Commerce's differential pricing analysis for the reasons stated in our recent decision in *Stupp*, 5 F.4th 1341, and remand for proceedings consistent with that decision.

We affirm the Court of International Trade's decision upholding Commerce's use of a freight revenue cap as a reasonable methodology to implement 19 U.S.C. § 1677a(c)(2)(A).

We affirm the Court of International Trade's decision upholding Commerce's use of SeAH's own data to calculate a profit cap as consistent with 19 U.S.C. § 1677b(e)(2)(B)(iii).

## AFFIRMED IN PART, VACATED IN PART, AND REMANDED

COSTS

No costs.